**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jairo ALZATE–RESTREPPO,**
**Defendant–Appellant.**

**NO. 88–5080.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 30, 1989.

Decided Nov. 13, 1989.

---

Before ALARCON and NELSON, Circuit Judges, and PATEL,* District Judge.

ALARCON, Circuit Judge:

Jairo Alzate–Restreppo appeals from the judgment entered upon his conviction after a bench trial for failure to report an attempt to transport more than $10,000 out of the United States in violation of 31 U.S.C. §§ 5316(a)(1)(A) and 5322(A), and making a false statement to an officer of the United States Customs Service in violation of 18 U.S.C. § 1001 (1982). He seeks reversal on the following grounds:

One. The conviction for failing to report his attempt to export more than $10,000 out of the United States must be reversed because the trial judge believed his testimony that he did not know that he was required to make a report.

Two. A false statement to a customs officer who is engaged in a criminal investigation that has focused on the defendant falls within the "exculpatory no" exception to section 1001. Because we have concluded that the evidence was sufficient to show a violation of each statute and that the "exculpatory no" defense is inapplicable under these facts, we affirm.

I

PERTINENT FACTS

On October 23, 1987, Alzate–Restreppo checked in at the Avianca ticket counter at 8:15 p.m. He had a ticket on flight No. 081. That flight was scheduled to depart to Bogota, Colombia, at 9:20 p.m. Alzate–Restreppo was observed pulling a suitcase toward the ticket counter by Senior Special Agent Robert Czyrklis of the United States Customs Service. Alzate–Restreppo was bent over at the waist. Czyrklis noticed an "abnormally large bulge" in Alzate–Restreppo's waist area. Czyrklis testified that Alzate–Restreppo removed his airline ticket and a three-quarters of an inch wad of

Elsa Leyva, O'Neill & Lysaght, Santa Monica, Cal., for defendant-appellant.

Gary S. Lincenberg, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

* Honorable Marilyn H. Patel, United States District Judge for the Northern District of California, sitting by designation.

currency from an inside pocket of his jacket "with some difficulty and awkwardly" without unbuttoning his jacket.

A notice in English and Spanish advising passengers of currency transportation reporting requirements was posted at the Avianca check-in counter. At approximately nine o'clock two additional notices were placed in the boarding area by Peter David Thompson, a Criminal Investigator for the United States Customs Service. Investigator Thompson also made an announcement in English and Spanish of the currency reporting requirements over the public address system in the boarding area. Alzate–Restreppo was in the boarding area when the announcement was made over the public address system. Alzate–Restreppo continued talking with others when the announcement was made in English, but appeared to be listening during the Spanish language version. At approximately 9:05 p.m., passengers began to board Avianca Flight No. 081. At this time Czyrklis entered the jetway. Investigators Thompson and Smith stationed themselves about ten feet away in the jetway.

Alzate–Restreppo entered the jetway at approximately 9:15. Investigator Smith identified himself and informed Alzate–Restreppo that the customs officers were "routinely advising passengers leaving the country of the law concerning the taking of money out of the country." Alzate–Restreppo attempted to brush past Smith and Thompson. Investigator Thompson asked Alzate–Restreppo if he had heard the announcement. Alzate–Restreppo responded that he had heard it. Investigator Thompson asked him how much money he was taking out of the United States. Alzate–Restreppo replied that he did not know how much money he had.

Investigator Thompson asked him to show the money to the customs officer. Alzate–Restreppo pulled out two folded over bundles of money from his pockets. The money in the two bundles totaled $2200. Alzate–Restreppo was asked if he was carrying any additional currency. Alzate–Restreppo replied "No, that's all the money I have."

Investigator Smith then patted down Alzate–Restreppo. He found two lumps. One was in the groin area, the other in the right front pants packet. A package was removed from Alzate–Restreppo's pants. It contained $20,900. Investigator Smith found $4300 in Alzate–Restreppo's right front pants pocket.

Alzate–Restreppo testified that he did not see any signs that advised passengers that transportation of more than $10,000 out of the United States must be reported. He also stated he did not pay attention to the announcement over the public address system. Alzate–Restreppo also testified that he did not understand that he had to make a report if he was taking more than $10,000 out of the United States.

Alzate–Restreppo admitted that he told the officers he did not have more than $2,200. He testified that he lied about the amount of money he was carrying because he thought it was illegal to transport more than $10,000. He did not know that it was illegal not to declare it. He stated that he had the money on his person because he was afraid that corrupt Colombian customs officers would take it away from him.

## II

## SUFFICIENCY OF THE EVIDENCE OF KNOWLEDGE OF THE REPORTING REQUIREMENT

Alzate–Restreppo argues that the government failed to meet its burden of persuading the trial court beyond a reasonable doubt that he had knowledge of the reporting requirements of sections 5316(a)(1)(A) and 5322(a) because the court expressly found that his testimony was credible except for his explanation of the reason he secreted a "wad of money in his pants."

■ In reviewing a claim that the evidence was insufficient, we are required to view the record in the light most favorable to the government and determine whether a rational trier of fact could find the elements of crime beyond a reasonable doubt. *United States v. Dadanian*, 818 F.2d 1443, 1446 (9th Cir.1987), *modified on other*

*grounds,* 856 F.2d 1391 (1988). We must also assume that the district court resolved all evidentiary conflicts in favor of the judgment. *United States v. Endicott,* 803 F.2d 506, 515 (9th Cir.1986).

Section 5316(a)(1)(A) provides in pertinent part: "[A] person ... shall file a report ... when a person knowingly ... transports, is about to transport ... monetary instruments of more than $10,000 at one time ... from a place in the United States to or through a place outside the United States...." We have previously held that in a prosecution under section 5316(a)(1)(A), the government must prove that the defendant had knowledge that (1) he was transporting funds in excess of $10,000 and (2) the law required him to submit a report. *United States v. Ibarra-Alcarez,* 830 F.2d 968, 974 (9th Cir.1987).

Alzate–Restreppo does not contend that the proof presented by the *government* was insufficient to persuade a rational trier of fact beyond a reasonable doubt that he had knowledge of his duty to report an attempt to transport more than $10,000 out of the United States. The government presented substantial evidence of the defendant's knowledge of his duty to report that he was attempting to transport more than $10,000 out of the United States. An announcement in English and Spanish was made on the public address system explaining the currency reporting requirements to all passengers in the boarding area. When questioned by the custom's officer, Alzate–Restreppo admitted that he heard the announcement over the public address system that the transportation of more than $10,000 out of the United States must be reported.

Posters advising passengers of the reporting requirement were placed at Avianca at the check-in counter. Alzate–Restreppo checked in at the Avianca counter. Additional posters were placed in front of the entrance to the jetway.

Alzate–Restreppo signed a custom's declaration when he entered the United States on June 14, 1987 which explained in English and Spanish that transporting more than $10,000 in or out of the United States must be reported. The declaration asked passengers to indicate whether they were transporting more than $10,000. The "no" box in the form was checked. In *United States v. Rodriquez,* 592 F.2d 553 (9th Cir. 1979), we held that the fact that appellant had signed a customs declaration form that set forth the reporting requirement was sufficient to prove that he had knowledge of the duty to make a report. *Id.* at 557.

After both sides rested, the district court granted Alzate–Restreppo's request to submit a motion for a judgment of acquittal. In his written motion, Alzate–Restreppo stated: "In order for Alzate to be found guilty of count one of the indictment the government must prove beyond a reasonable doubt that Alzate knew of the reporting requirement." In the government's response to the motion for a judgment of acquittal, the district court was reminded that knowledge of the reporting requirement was an essential element of a prosecution pursuant to section 5316(a)(1)(A). Thus, it is quite evident that the judge was made aware by both parties that Alzate–Restreppo could not be convicted of count one of the indictment unless the court was convinced beyond a reasonable doubt of the section 5316(a)(1)(A) reporting requirement.

After listening to counsel's argument, the district court stated: "Gentlemen, I do not have in mind a reasonable doubt at all that the defendant is guilty of both of the offenses charged."

Alzate–Restreppo testified that he did not understand that the law required that he report to the Customs Service the transportation of more than $10,000 out of the United States. Alzate–Restreppo argues that the conviction for a violation of section 5316(a)(1)(A) must be reversed because the district court commented as follows prior to finding him guilty:

For the record, for whatever purpose it may later serve, I will say that with one exception, I thought that the defendant testified truthfully. I did not believe that he secreted that wad of money in his pants in the Los Angeles Airport because he was worried about Colombian authorities. I found that to be frankly incredi-

ble. But in every other respect I believed him. I thought his testimony was forthright in every other respect, and I am on record as saying that.

I don't know where all this is going to lead. It certainly was not your classic standard cocaine repatriation of funds either in amount or technique. But I must say I am convinced beyond a reasonable doubt that he violated both statutes. The second one is crystal clear. I wouldn't have any doubt at all, and I don't have any reasonable doubt about the first one.

The district court did not explain its reasons for commenting on Alzate–Restreppo's credibility or which portion of his testimony was believable. It is clear from the district court's comments that it did not believe Alzate–Restreppo's explanation that he hid more than $10,000 in his clothing to deceive *Colombian* custom's officers.

Alzate–Restreppo also testified that he was taking the money to Colombia "for some operations." We are required to view the record in the light most favorable to the prevailing party. The trial judge's comment that this was not a "classic cocaine repatriation of funds" can be construed as an implied finding that the court believed Alzate–Restreppo's testimony that he was transporting currency to Colombia to pay for medical treatment. This construction of the record would explain the court's comment that its credibility determination was being made "for whatever purpose it may later serve." The fact that the court determined that Alzate–Restreppo was not involved in narcotics trafficking might have an impact on the decision making of federal agencies concerned with his probation or immigration status. *See e.g.,* 8 U.S.C. § 1251(a)(11) (attorney general may order deportation of any alien who "has been convicted of a violation of ... any law ... relating to a controlled substance").

█ The district court made no express credibility finding concerning Alzate–Restreppo's knowledge of the currency reporting requirement. Adoption of Alzate–Res-

treppo's interpretation of the court's remarks would require us to infer that the court ignored its duty to acquit unless knowledge was proved beyond a reasonable doubt. We are also mindful of our duty to assume that the district court resolved any evidentiary conflicts in favor of its conclusion that each of the elements of a violation of section 5316(a)(1)(A) had been proved beyond a reasonable doubt. *Endicott,* 803 F.2d at 514–15.

█ The district court did not prepare any written findings of fact. Prior to trial, the parties waived their right to request special findings of facts. Where specific findings are not requested or prepared, we will uphold a judgment if it is supported by the record although the "district judge's oral decision could have been more precise." *United States v. Twine,* 853 F.2d 676, 681 (9th Cir.1988).

█ The record contains sufficient evidence to convince a rational trier of fact beyond a reasonable doubt that Alzate–Restreppo had knowledge of the reporting requirement set forth in section 5316(a)(1)(A). Accordingly, the judgment of conviction of a violation of section 5316(a)(1)(A) must be sustained.

### III

### APPLICABILITY OF THE "EXCULPATORY NO" DEFENSE

█ Alzate–Restreppo claims that his false denial that he was not transporting more than $2200 is not a violation of section 1001 because his statement was made during a criminal investigation in response to an investigator's question.

Section 1001 provides in pertinent part: "Whoever, in any matter within the jurisdiction of any department or agency of the United States ... makes any false, fictitious or fraudulent statements ... shall be fined ... or imprisoned...."

We are required to construe section 1001 broadly to protect "myriad governmental activities." *United States v. Rodgers,* 466 U.S. 475, 480–81, 104 S.Ct. 1942, 1946–47,

80 L.Ed.2d 492 (1984). In this circuit, we have recognized a judicial exception or defense to the application of section 1001 to false statements made to a federal department or agency under certain circumstances. This defense is referred to as the "exculpatory no" doctrine. *United States v. Medina de Perez*, 799 F.2d 540, 544 (9th Cir.1986). We have adopted a five part test to determine whether the "exculpatory no" defense is applicable in a prosecution pursuant to section 1001.

(1) the false statement must be unrelated to a claim to a privilege or a claim against the government;

(2) the declarant must be responding to inquiries initiated by a federal agency or department;

(3) the false statement must not impair the basic functions entrusted by law to the agency;

(4) the government's inquiries must not constitute a routine exercise of administrative responsibility; and

(5) a truthful answer would have incriminated the declarant.

*United States v. Equihua–Juarez*, 851 F.2d 1222, 1224 (9th Cir.1988) (citing *Medina de Perez*, 799 F.2d at 544 and n. 5). "[T]he exculpatory no doctrine is inapplicable if the defendant fails to satisfy any one of the above requirements." *United States v. Becker*, 855 F.2d 644, 646 (9th Cir.1988). The application of the "exculpatory no" defense to a prosecution under section 1001 is a legal question we review independently without deference to the district court's rulings. *Equihua–Juarez*, 851 F.2d at 1224. The narrow question we must decide is whether the record shows that the Custom Service agent's inquiry was a routine exercise of administrative responsibility.

The uncontradicted evidence presented at trial demonstrates that the Customs Service officers were engaged in routine administrative duties at the time they asked Alzate–Restreppo if he was carrying any funds in addition to the $2,200 he had shown the Customs Service officials. Agent Czyrklis described his duties as follows: "My duties are to see that people comply with the laws, that they report any currency going out of the United States and to monitor any people that will not declare the money going out of the United States".

Criminal Investigator Thompson testified as follows:

"My principal duties are to advise passengers leaving the country of the U.S. laws regarding the transportation of money outside of the country and to monitor those passengers leaving the country for compliance."

Alzate–Restreppo contends that the "exculpatory no" defense is applicable because his statement was in response to inquiries initiated by a criminal investigator during a criminal investigation. This argument assumes that section 1001 does not apply to a false statement made in response to inquiries by a federal law enforcement officer during a criminal investigation.

The Supreme Court has not been called upon to decide whether the "exculpatory no" defense is available in a prosecution pursuant to section 1001. The Court has determined, however, that the words "any matter" as used in section 1001 apply to a "criminal investigation" conducted by the "FBI and the Secret Service." *Rodgers*, 466 U.S. at 479, 104 S.Ct. at 1946. In *Rodgers*, the defendant telephoned the FBI and reported that his wife had been kidnapped. *Id.* at 477, 104 S.Ct. at 1945. Two weeks later, he contacted the Secret Service and reported that she was involved in a plot to kill the President. Each of these reports was false. *Id.* His intent was to induce these federal agencies to find his missing spouse. *Id.* The Court concluded in *Rodgers* that these facts stated an offense under section 1001 and reversed the judgment of the Court of Appeals which had upheld dismissal of the indictment. *Id.* at 484, 104 S.Ct. at 1948.

The false statements in *Rodgers* were volunteered by the defendant. The false reports were not made in response to a criminal investigator's inquiry. In this circuit we have distinguished between inquiries made in course of monitoring compliance with federal law and an interroga-

tion directed at eliciting information to be used in the prosecution of a person who has been arrested. *Becker*, 855 F.2d at 645–46; *see also United States v. Myers*, 878 F.2d 1142, 1143–44 (9th Cir.1989) (distinguishing between statements made in an administrative context and those made in response to a criminal investigation during which the defendant was subjected to a search, detention, a polygraph examination, and a *Miranda* warning).

Alzate–Restreppo argues that our decisions in *Medina de Perez* and *Equihua–Juarez* compel application of the "exculpatory no" defense under these facts. We disagree.

In *Medina de Perez*, a customs inspector arrested the defendant at the Port of Entry in San Ysidro, California, after discovering marijuana hidden in the ceiling of a camper shell. 799 F.2d at 541. Medina de Perez was placed in a detaining cell. She was advised of her *Miranda* rights. *Id.* She was then interrogated by an agent of the Drug Enforcement Agency and a United States Customs agent. She was subsequently indicted for making false statements in violation of section 1001 during this interrogation. *Id.* at 542. In reversing the judgment of conviction in *Medina de Perez*, we stated:

> [W]ithout doubt, during the *post-arrest interrogation,* agent Tierney was acting as a police investigator and not as a program administrator, and therefore his inquiries could not constitute a 'routine exercise of administrative responsibility.'

*Id.* at 545–46 (emphasis added).

In *Equihua–Juarez*, the defendant was arrested for entering the United States illegally. 851 F.2d at 1223. He was taken to a Border Patrol station where he was questioned after being advised of his constitutional rights. Equihua–Juarez was asked to state his name. He gave a false answer. *Id.* Equihua–Juarez was indicted under section 1001 for giving a false name. We reversed relying on *Medina de Perez*. *Id.* at 1225–27.

The instant matter is readily distinguishable from *Medina de Perez* and *Equihua–Juarez*. Alzate–Restreppo was not under arrest at the time he was questioned, nor was the questioning an in-custodial interrogation. The customs agents had no information that he was transporting currency in violation of federal law. Prior to questioning him, the Customs Service officers did not know what caused the "abnormally large bulge" in Alzate–Restreppo's clothing. The Customs Service officers' questions were directed at ascertaining whether Alzate–Restreppo was transporting more than $10,000.

In *United States v. Becker*, we were required to determine whether *Medina de Perez* applied to an inquiry made by Customs Service officers *prior* to an arrest. 855 F.2d at 645–46. We held that the "exculpatory no" defense was inapplicable to a *pre-arrest noncustodial* interrogation by a Customs Service officer. *Id.* at 646. In *Becker*, the defendant drove a station wagon to the Port of Entry at Tecate, California. A Customs Service officer asked Becker and his companion Nancy Mae Hoyt, for a declaration of citizenship and proof of identity. *Id.* at 644–45. When Hoyt did not produce any identification, the customs agent directed the station wagon to a secondary inspection station. There Becker was interrogated concerning his citizenship and the ownership of the station wagon. Becker replied that he had owned the car for a week. *Id.* at 645. This information was false. *Id.*

Becker was indicted and convicted for violating section 1001. We held that the "exculpatory no" defense was inapplicable because Becker had failed to show that the Custom Service officer's inquiries did not constitute a routine exercise of administrative responsibility. *Id.* at 646. We concluded that "[t]he interrogation by the Customs officer clearly began as an administrative determination of Becker's status at the border...." *Id.*

In this matter, the interrogation by the Customs officers was initiated to determine how much money he was transporting out of the United States. Alzate–Restreppo's false statements were made in response to a pre-arrest noncustodial inquiry in an "administrative context." *Becker*, 855 F.2d at

646. Thus, the "exculpatory no" defense is inapplicable because Alzate–Restreppo has failed to satisfy all of the *Medina de Perez* factors.

The judgment is affirmed.

PATEL, District Judge, Concurring in the Judgment, joined by Judge NELSON:

I concur in the majority's conclusion. I write separately, however, to note how we have arrived at that conclusion without engaging in the cumbersome test this circuit has laid down in *United States v. Medina de Perez*, 799 F.2d 540 (9th Cir.1986).

It seems to me that the *Medina de Perez* analysis is unnecessary and has resulted in some curious dicta in recent cases. For example, this court recently observed in applying the third factor of the test, i.e., that the false statement must not impair the basic functions of the agency, that "a good investigator will expect the accused to lie" and therefore will go forward with the investigation without reliance on the false statement and not be impeded in its functions. *United States v. Myers*, 878 F.2d 1142, 1144 (9th Cir.1989). This line of reasoning is disturbing. May we not then conclude that a defendant taking the stand in his own defense will be expected to lie in order to exculpate himself? Furthermore, under this reasoning, it is doubtful statements such as those involved in *Myers* would even meet the threshold requirement of materiality since they lack the "propensity or capacity to influence or affect an agency's decision." *See United States v. Rodriquez–Rodriquez*, 840 F.2d 697, 700 (9th Cir.1988). Since materiality is a critical element of 18 U.S.C. § 1001, this factor of the test seems redundant. Reviewing the "exculpatory no" cases in this and other circuits, I believe the five-factor analysis we have employed is unnecessary and distortive.

The "exculpatory no" defense had its earliest explication in *United States v. Stark*, 131 F.Supp. 190 (D.Md.1955). *Stark* throughly analyzed the history and purpose of section 1001, finding that Congress intended to protect the government from deceptive practices that might impair its legitimate functions. It held that false statements made to the Federal Bureau of Investigation in the course of its investigation of fraud in federally insured mortgages were not "statements" within the meaning of section 1001 because they were not made in relation to any claim or to obtain a benefit from the government and because they were not initiated or volunteered by the defendants. The court concluded that because the statements were given in response to investigative inquiries by the government they were not within the purview of section 1001.

As with subsequent courts considering the use of section 1001 in this context, the *Stark* court was troubled by the implication of fifth amendment rights since the defendants were targets of criminal charges. As the court observed, the criminal justice system would be seriously affected if indictments for bribery, fraud and perjury were abandoned in favor of section 1001 prosecutions for violations occurring during the investigation of the original charges. The government would lose significant grounds for indictment and the defendant's fifth amendment rights would be threatened. This, the court decided, was not what Congress contemplated when it enacted section 1001. *Id.* at 207. Thus, the "exculpatory no" defense was seen as a way to serve legislative intent, and to balance the legitimate needs of the government and criminal defendants.

The Fifth Circuit was the first to embrace the "exculpatory no" defense. In *Paternostro v. United States*, 311 F.2d 298 (5th Cir.1962), following the reasoning in *Stark*, the court found that where the false statements were not related to any claim or benefit such as obtaining employment and were not "aggressively and deliberately" initiated by the defendant in order to pervert the government agency's authorized functions, they were not statements within the meaning of section 1001. *Id.* at 305.

The fact common to all of the early cases recognizing the "exculpatory no" defense is the nature of the statements. They were responses that were merely negative or

simple denials. Recently, however, the defense has been expanded to include elaborate fabrications. *Compare United States v. Duncan,* 693 F.2d 971, 976 (9th Cir. 1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983) ("exculpatory no" exception not allowed where defendant did more than merely say no, but added affirmative statements) *with United States v. Myers,* 878 F.2d at 1143 (exception allowed even though the statement was a detailed story made up to avoid penalties and prosecution).

What is also noteworthy about this circuit's recent opinions allowing the "exculpatory no" defense is that in each the defendant has been in a postarrest or detention status. *See, e.g., id.* at 1144 (defendant had been detained and given his *Miranda* rights at time statement made); *United States v. Equihua–Juarez,* 851 F.2d 1222 (9th Cir.1988) (statement made in a "postarrest interview"); *United States v. Medina de Perez,* 799 F.2d 540 (9th Cir. 1986) (involving postarrest statements).

However, when the offending statements have been made before *Miranda* rights have been implicated this circuit has found the defense is not available. *See, e.g., United States v. Becker,* 855 F.2d 644 (9th Cir.1988) (statement made during prearrest, noncustodial interrogation); *United States v. Segall,* 833 F.2d 144 (9th Cir.1987) (defendant subject to investigation, but not in custody and no probable cause status); *United States v. Olsowy,* 836 F.2d 439 (9th Cir.1987), *cert. denied,* 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988) (statements given prearrest, except as to one count where *Miranda* rights voluntarily waived); *United States v. Des Jardins,* 772 F.2d 578 (9th Cir.1985) (defendant in noncustodial status and no probable cause to

believe she had committed offense at time questions asked); *United States v. Gonzalez–Mares,* 752 F.2d 1485 (9th Cir.), *cert. denied,* 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985) (defense did not apply to probation pre-plea inquiry; not a custodial setting and no likelihood of self-incrimination); *United States v. Duncan,* 693 F.2d 971 (9th Cir.1982) (at time statement made no evidence that defendant had committed crime or that there was probable cause to arrest him); *United States v. Rose,* 570 F.2d 1358 (9th Cir.1978) (answers given in course of agent's administrative duties; defendant not in custody or self-incriminatory position).

Thus, even after laboriously applying the five-factor test, the bottom line has been determined by the custodial or nearcustodial status of the defendant. This leads me to query whether this test is necessary. Perhaps it has been prompted by the agonizing concern so aptly described by Judge Godbold, "[u]ndoubtedly the judicial gloss put on § 1001 by the 'exculpatory no' decisions originates at least in part from latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment." *United States v. Lambert,* 501 F.2d 943, 946 n. 4 (5th Cir.1974).

However, the test framed by this circuit takes us far afield from these basic fifth amendment concerns. We need not take such a circuitous detour in order to protect fifth amendment guarantees. As the Eleventh Circuit has held, the doctrine should be limited to "cases involving substantial and real hazards of self-incrimination." *United States v. Payne,* 750 F.2d 844, 863 (11th Cir.1985).[1] This can ordinarily be accomplished by looking to whether, at the time of the statement, there was reason-

---

1. *Payne* extended the defense to land bank fraud, 18 U.S.C. § 1006. However, the court rejected its use on the facts before it, finding that truthful answers would not have been incriminatory. *Payne* rejects the investigatory and administrative distinctions this circuit has recognized and focuses upon the self-incrimination inquiry. *See, e.g., United States v. Becker,* 855 F.2d 644 (9th Cir.1988). Other circuits have been reluctant to adopt the "exculpatory no" defense or have indicated they would interpret it narrowly if adopted. *See United States v.*

*Capo,* 791 F.2d 1054, 1069 (2nd Cir.1986) (although vacated in part on rehearing in part, *en banc,* 817 F.2d 947 (2nd Cir.1987), the court's holding did not impugn the vitality of its original view that "we have consistently stated that if we did adopt it we would construe it narrowly"); *United States v. Fitzgibbon,* 619 F.2d 874 (10th Cir.1980) (limited to cases of possible self-incrimination). The Fourth Circuit, on the other hand, has adopted the *Medina de Perez* test. *See United States v. Cogdell,* 844 F.2d 179 (4th Cir.1988).

able cause to detain or probable cause to arrest the defendant or whether he was the subject of a criminal investigation. In any of those instances, which are factually "uncomfortably close to the fifth amendment," a negative response should not be considered a violation of section 1001. Courts and prosecutors are readily familiar with these standards. There is no need to superimpose upon well-understood principles the unwieldy *Medina de Perez* factors in order to give effect to the "exculpatory no" doctrine, as Judge Alarcon's concise analysis in this case clearly demonstrates. I would abandon the five-factor test in favor of his approach.