892 F.2d 83
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Ralph W. MYERS, Petitioner,
v.
FEDERAL AVIATION ADMINISTRATION, Respondent.
 No. 88-7369.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 3, 1989.
Decided Dec. 12, 1989.
 
 Before NELSON, TROTT and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 Respondent T. Allan McArtor, Administrator of the Federal Aviation Administration ("FAA"), revoked appellant Ralph W. Myers' pilot's license after Myers made an unauthorized entry into prohibited airspace over President Reagan's ranch while the President and his entourage were approaching the area. The emergency order was subsequently upheld by Administrative Law Judge Jerrell R. Davis ("ALJ" or "Judge Davis") and affirmed on appeal by the National Transportation Safety Board ("NTSB" or "Board"). The instant appeal followed, and the court affirms the judgment of the NTSB.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 On August 13, 1987, appellant took off from the airport in Lompoc, California in his single-engine "Archer" airplane en route to John Wayne Airport in Orange County, California. He was carrying one passenger, allegedly for "compensation on hire", who was travelling to Orange County on business. Incident to the flight, appellant allegedly flew over Rancho del Cielo, the west coast residence of then-President Reagan. The airspace directly over the Ranch is a prohibited area designated as "P-66" in the Federal Aviation Regulations ("FARs"). At the time of Myers' alleged incursion into P-66, the President and his entourage were approaching the Ranch. Myers' proximity to Marine I (the President's helicopter), as well as the other aircraft, was sufficiently close to create a collision hazard in the opinion of FAA Administrator McArtor. Accordingly, and in light of other alleged violations,[1] McArtor issued an emergency order revoking Myers' private pilot certificate the following day.
 
 
 4
 On August 17, Myers filed a Notice of Appeal with the NTSB. The Board responded on August 20, advising appellant that although he was entitled to have his appeal handled under the emergency procedures specified in 49 C.F.R. 821.54 through 821.57, he may choose to waive such procedures, in which event a hearing would be set at a more suitable time. On August 25, Myers notified the Board that he was willing to waive his right to an emergency hearing (within 10 days) and requested alternatively that a hearing be convened within 45 days.
 
 
 5
 The matter was subsequently assigned to Judge Davis and was set for hearing on October 1 and 2. When the evidentiary portion of the proceeding had not yet been concluded on the evening of October 6, Judge Davis notified the parties that it would be impossible for him to dispose of the case within 60 days of receiving notification that an emergency existed. He then continued the hearing until December, assuring the parties that if an earlier date became available, he would notify them.[2]
 
 
 6
 Before the hearing reconvened, however, Myers informed the judge that he rested his case and requested an immediate bench opinion based upon the evidence currently in the record. On December 30, Judge Davis denied the request stating that this denial would not preclude Myers from completing the presentation of his case at the rescheduled hearing. Two days later, appellant again requested a decision, advising the ALJ that he had "no intention" of introducing any further evidence. Judge Davis again denied the request and rescheduled the hearing "for the purpose of complainant presenting his case in rebuttal." At the conclusion of this proceeding on February 10, 1988, the ALJ issued an oral decision in favor of the Administrator's finding that he had proven by a preponderance of the evidence that Myers had violated a number of FARs and demonstrated a lack of qualification such that "safety in air commerce ... and the public interest require[d] affirmation of the amended order of revocation." Myers appealed the decision to the NTSB which affirmed the ALJ in an opinion issued on August 31, 1988. The instant appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 7
 Under the Administrative Procedure Act, the reviewing court shall set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); see Corey v. NTSB, 822 F.2d 9, 10 (2d Cir.1987). The NTSB's findings of fact are conclusive when supported by substantial evidence in the record. 49 U.S.C. § 1486(e); see Meik v. NTSB, 710 F.2d 584, 586 (9th Cir.1983). Thus, the findings must "logically arise from the facts. They need not be the only result which could so arise." Meik, 710 F.2d at 586; see also Western Air Lines v. Civil Aeronautics Bd., 495 F.2d 145, 152 (D.C.Cir.1974) (conclusion may be supported by substantial evidence even if plausible interpretation of the evidence supports contrary view). Purely legal issues are, of course, reviewed de novo by the reviewing court. Go Leasing, Inc. v. NTSB, 800 F.2d 1514, 1517 (9th Cir.1986).
 
 II. Fairness and Impartiality of the Hearing
 
 8
 Appellant raises a number of issues, most of which are evidentiary, to suggest that he was denied a fair and impartial hearing by the NTSB. Considering these issues in aggregate, it is clear that the manner in which the ALJ conducted the hearing did not constitute an abuse of discretion.
 
 A. Emergency Procedures
 
 9
 Appellant contends that since his case was subject to the emergency procedures of 49 U.S.C. § 1429(a), he was entitled to an immediate hearing and expedited appeal to be concluded within 60 days. Myers argues that the ALJ's failure to abide by these guidelines violated his due process rights.
 
 
 10
 The Board rejected this argument noting that when Myers waived his right to have a hearing within 10 days of the revocation, he likewise relinquished his right to a 60-day disposition of the appeal. While the agency will endeavor to reach a decision as expeditiously as possible, the Board explained that
 
 
 11
 [a] delay in convening an emergency hearing, however minimal, will inevitably affect the Board's ability to meet its statutory obligation to "finally dispose of" an emergency case within 60 days, even if it does not, as in this proceeding, actually preclude compliance with the deadline.
 
 
 12
 NTSB opinion at 10-11.
 
 
 13
 The agency's reasoning is sound. The 60-day requirement does not exist in a vacuum, but rather is dependent on the timely occurrence of an initial hearing. If a complainant chooses to extend the initial 10-day period to 45 days, as in the instant case, he cannot expect the 60-day requirement to remain undisturbed in light of the breadth of the ALJ's caseload. Appellant's contention is, therefore, without merit.
 
 B. Evidentiary Concerns
 
 14
 Appellant claims that Judge Davis' erroneous rulings on a number of important evidentiary matters denied him a fair hearing and that the Board abused its discretion in failing to reverse the order of revocation on this basis. This contention is without merit.
 
 1. Presenting Additional Evidence
 
 15
 Myers asserts that he should have been permitted to present additional evidence when the hearing reconvened in February 1988 and that it was error for the ALJ to have denied his request to do so. We would concur, were it not for the fact that appellant had previously indicated that he rested his case and desired an immediate bench decision. Appellee objected to the issuance of any such order, and Judge Davis accordingly agreed to reconvene the hearing "for the purpose of complainant presenting his case in rebuttal." Appellant did not object to the order reconvening the hearing, issued in January 1988. It was only after hearing the government's case the following month that appellant sought to introduce additional evidence and to testify on his behalf. In light of this procedural posture, we cannot conclude that the ALJ abused his discretion in denying appellant's requests.
 
 2. Permitting Cross-Examination
 
 16
 Appellant contends that the ALJ erred in sustaining appellees' objections to hypotheticals put to government witnesses on cross-examination in which the witnesses were asked if their opinions as to Myers' conduct would change if they were told that the point at which the Archer and Marine I had been in closest proximity was outside P-66. The objection was sustained based on Myers' assumption of facts not in evidence. If he wished to proceed with this line of questioning, appellant would have first needed to lay an appropriate foundation or develop the testimony he was seeking through his own experts. The ALJ's conduct was not an abuse of discretion.
 
 
 17
 Appellant also objected to the "suggestive" nature of a map used by the government on direct. Witnesses were asked to mark the points at which they saw the Archer and Marine I, but, Myers argues, the fact that the map was limited to P-66 prejudiced their testimony. This argument is without merit since the map was presented to witnesses only after they had testified that the events in question had taken place inside P-66. Because a proper foundation had been laid, Judge Davis was correct in overruling the objections.
 
 3. Excluding the NASA Report
 
 18
 Under the Aviation Safety Reporting Program, a pilot who files a report with NASA concerning alleged FAR violations may be entitled to a waiver of sanction for negligent acts, even though a finding of violation may be made. Since he filed such a report, Myers argues that any penalty imposed upon him for the events of September 13, 1987 should accordingly be waived.
 
 
 19
 This issue is, however, a red herring in the context of this case since the waiver is inapplicable to actions which disclose a lack of qualification or competency and the Board affirmed the ALJ's finding that Myers "demonstrated recklessness and a lack of qualification."
 
 4. Refusing to Issue Subpoenas
 
 20
 Appellant contends that the ALJ abused his discretion in refusing to issue subpoenas to recall the pilots who had testified on behalf of the government. This refusal was consistent with the Judge's statements during the hearing that once a witness was dismissed, he could not be recalled later on in the proceeding. Significantly, there is no indication that Myers' latitude in cross-examining these witnesses was limited in any way; in fact, the record reflects that several of the pilots were cross-examined at length. Because Myers was afforded an adequate opportunity to examine the pilots, the ALJ's refusal to issue subpoenas to allow appellant to recall them cannot be considered an abuse of discretion.
 
 
 21
 More troublesome is the ALJ's quashing of a subpoena served on Secretary of Defense Carlucci. The subpoena had been issued by the Chief ALJ prior to the assignment of this case to Judge Davis. On appeal, the Board affirmed the ALJ, finding that Carlucci did not have enough knowledge of the matter to assist the fact finder. What is troublesome is a statement made by Carlucci in his declaration to the court. He stated that he "saw a plane in the distance as Marine I approached the ranch, but that plane appeared to be well away from us." Appellant's argument that this statement is ambiguous is well taken; it is possible, if unlikely, that Carlucci's recollections would support the theory of the path of the Archer urged by Myers. Thus, we believe that Judge Davis' refusal to allow the subpoena to issue was an abuse of discretion.[3] This in itself, however, is insufficient to vacate the decision of the Board.
 
 5. Admitting the Criminal Conviction
 
 22
 Finally, appellant argues that the introduction of the record of his criminal conviction was improper as it was more prejudicial than probative. See United States v. Myers, 878 F.2d 1142 (9th Cir.1989) (affirming in part, reversing in part, and remanding criminal conviction of Ralph W. Myers). While we do not agree that the record's prejudicial effect necessarily outweighs its probative value,[4] this inquiry is immaterial in light of the NTSB's determination that the criminal record was irrelevant to the instant dispute and thus not worthy of consideration in arriving at an appropriate sanction. See NTSB Order at 14 n. 15.
 
 III. Substantial Evidence
 
 23
 As aforementioned, the NTSB's findings of fact are conclusive when supported by substantial evidence in the record. 49 U.S.C. § 1486(e); see Meik v. NTSB, 710 F.2d 584, 586 (9th Cir.1983). Accordingly, the agency's conclusions must be justified by the record, notwithstanding the possible existence of a plausible alternative interpretation of the evidence. Judged in accordance with this standard, it is clear that the Board's decision was supported by substantial evidence.
 
 
 24
 A. A Near Mid-Air Collision?
 
 
 25
 Appellant argues at length that there was no "near mid-air collision" between his plane and Marine I. While this may be true, the issue is of no consequence since the FAA has never based its decision on any such occurrence or argued that such conduct alone warranted revocation of Myers' airman certificate. In affirming the ALJ's order, moreover, the NTSB expressly chose not to base its decision on any potential near mid-air collision:
 
 
 26
 [Myers] suggests his certificate was suspended ... because of the erroneous belief that he had been involved in a near mid-air collision with the President's helicopter. Whether this speculation is true is irrelevant to this proceeding ... We are [ ] satisfied from our review of the record that, regardless of how the incident is labelled and despite possible initial overreactions based on a concern that respondent's flight had more seriously imperiled the President than was subsequently determined to have been the case, the charges affirmed by the law judge are fully supported by the evidence.
 
 
 27
 NTSB Order at 7 n. 4. The relevant inquiry is therefore whether the charges affirmed by the Board are in fact justified by the record.
 
 
 28
 B. A Collision Hazard?
 
 
 29
 The Board found that the Archer was operated sufficiently close to Marine I and Nighthawk II to create a collision hazard. A number of witnesses testified to this effect. For example, Major Wehrle, pilot-in-command of Nighthawk II, testified that during his final approach into Rancho del Cielo appellant's plane passed within 100 to 150 feet of him laterally and 75 to 100 feet virtically. The pilot-in-command of Marine I stated that the Archer passed 100 to 150 feet below him and 200 to 300 feet laterally and would have presented a collision hazard but for the advisories he received from air traffic controllers. Major Thomas, U.S. Army Aide to the President, who was standing on the helipad, added that appellant's plane crossed the path of the landing Nighthawk at an altitude of no more than 50 feet and appeared to cross the path of the Marine I as well. It is unnecessary to belabor this issue further; substantial evidence clearly existed for the Board's conclusion.
 
 
 30
 C. Incursion into Prohibited or Restricted Areas without Authorization
 
 
 31
 The FAA contended, and the NTSB found, that Myers operated his aircraft within prohibited or restricted areas, most significantly P-66, without authorization. The government provided a host of witnesses who placed the Archer within prohibited areas, e.g. Santa Barbara Air Traffic Controllers, Major Wehrle, Major Thomas, Captain Horsley of the Santa Barbara County Sheriff's Department. The mainstay of appellant's defense to this testimony is radar data based on the National Track Analysis Program ("NTAP") which, according to Myers' expert, place the Archer and Marine I approximately 1000 feet from each other horizontally and half of a nautical mile south of P-66 at their closest point.
 
 
 32
 In rebuttal, the government called Lewis Manning, an automation expert, who testified that the NTAP is not designed to depict aircraft at low altitudes over mountainous terrain such as that of P-66. The NTAP is a search and rescue tool used to help find down aircraft; the long-range radar which it generates is not accurate and reliable enough in areas such as P-66 to be used to separate live airplanes. The short-range radar used by the Santa Barbara Air Traffic Controllers is, in Manning's opinion, much more reliable in this context.
 
 
 33
 Judge Davis decided to credit the testimony of Manning and the other government witnesses over the radar data urged by appellant. The NTSB affirmed, finding that the Manning testimony "clearly rebutted [Myers'] evidence." NTSB Order at 9 & n. 6. We cannot conclude that the agency's decision to favor the testimony of percipient witnesses over that of radar data whose reliability is a matter of debate constitutes an abuse of discretion. There was a clear discrepancy between the two which required the trier of fact to make a choice; substantial evidence supports his decision.
 
 D. Flight for Compensation or Hire
 
 34
 The NTSB sustained Judge Davis' finding that appellant violated FAR § 135.5 by operating a flight for compensation or hire without the appropriate certification. Only one witness, aviation safety inspector Bogart, testified on this issue. He reported that he had spoken with Myers' passenger, Harlan Jones, who had told him that he needed to travel to Orange County on business and had contacted Myers for that purpose. According to Jones, the two agreed that Jones would pay for the fuel and Myers would obtain the plane.
 
 
 35
 Appellant does not take issue, for the most part, with this version of the facts. He argues, instead, that the above arrangement is not indicative of a flight for hire since Myers was not paid for piloting the plane; the two merely shared expenses. The government notes, however, that the "sharing of expenses" exception applies only where a pilot is making a trip for his own purposes, i.e. where the pilot and passenger share a common purpose. See Administrator v. Reimer, 3 NTSB 2306, 2308 (1980). In the instant case, there is no indication of any such commonality of purpose, as appellant put on no witnesses and introduced no evidence on his behalf with respect to this issue. In the face of his silence, substantial evidence supports the conclusions drawn by the ALJ, and affirmed by the Board, based on Bogart's testimony.
 
 IV. Propriety of the Sanction
 
 36
 Notwithstanding his culpability for the offenses charged, appellant does not believe that the sanction of revocation was appropriate.[5] He notes, for example, that the customary penalty for inadvertent intrusions into prohibited areas is a 30-day suspension, not revocation. See, e.g., Administrator v. Rourke, 1 NTSB 1299 (1983); Administrator v. Crane, 1 NTSB 1418 (1983). That is correct, but this was not a simple, accidental foray into P-66. The ALJ found that the incursion was deliberate, reckless, and without authorization, notwithstanding the potential jeopardy to the President's life.
 
 
 37
 Appellant also takes issue with the characterization of his conduct as "reckless" by the ALJ. He claims that any irregularity in his maneuvering of the Archer was caused by the tailgating of his plane by the Nighthawk III, which was piloted by Captain Michael Duva. Duva testified, however, that he was no closer than 75 feet from Myers' plane, and 20 to 30 feet above it, for a period of no longer than 10 seconds to enable him to read the serial number on the aircraft. Appellant also mistakenly charges Duva with violating the "see and be seen" concept by failing to avoid the Archer after sighting it. Separation in controlled airspace is provided by the air traffic controllers, not by the "see and be seen" concept. See Administrator v. Demar, NTSB Order No. EA 2393 at 12 (1986).
 
 
 38
 In light of the breadth and gravity of appellant's violations of the FAR, the NTSB was warranted in concluding that his aircraft was operated "in a careless or reckless manner so as to endanger life or property." See Haines v. DOT, 449 F.2d 1075, 1076 (D.C.Cir.1971) ("potential danger" to passengers and airplane is sufficient to justify finding of § 91.9 violation). Though limited to a single flight, such conduct is sufficient to warrant revocation where, as here, it is so egregious as to demonstrate a lack of qualification. Administrator v. Wingo, NTSB Order No. EA-1991 at 4-5 (1984); see also Administrator v. Hock, NTSB Order No. EA-2267 at 6 (1986).
 
 CONCLUSION
 
 39
 The NTSB did not abuse its discretion by revoking appellant's pilot's license and its decision should therefore be affirmed. The appellant was not denied a fair and impartial hearing before the ALJ, and the conclusions drawn by the agency are supported by substantial evidence in the record. Revocation is, moreover, an appropriate sanction in light of the gravity of appellant's misconduct and the breadth of his violations of the FAR.
 
 
 40
 Accordingly, the decision of the National Transportation Safety Board is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 For example, McArtor alleged, inter alia, that Myers was not authorized to carry a passenger for compensation or hire, that he did not possess updated charts covering the route of flight, that he entered the restricted area designated as R-2519 in the vicinity of the Point Mugu Naval Air Station without authorization, that he flew within the point Mugu Naval Air Station Airport Traffic Area without authorization, and that he operated his aircraft recklessly "so as to endanger the lives or property of others."
 
 
 [2]
 Myers' counsel subsequently declined invitations to reconvene the hearing at the end of October or the beginning of November
 
 
 [3]
 Appellant also contends that the ALJ's quashing of a subpoena served on former Chief of Staff Howard Baker was an abuse of discretion. Because Baker appeared to have no knowledge whatsoever about the presence of any other aircraft in the viciity of Marine I, Myers' argument is unfounded
 
 
 [4]
 Appellant was convicted of making false statements to federal agents investigating the incident which is the subject of the instant case. Thus, insofar as the record is relevant to the issue of appellant's credibility, it was properly admitted
 
 
 [5]
 In his reply papers, appellant notes that he regained his private pilot certificate in January 1989, approximately 17 months after it was revoked. He indicates that he is pursuing this appeal to clear his name and restore his damaged reputation as an airman
 The reinstatement of Myers' piloting privileges does not present a problem of mootness because of the collateral consequences of the findings affirmed by the Board. If Myers were to violate FARs in the future, for example, the presence on his record of previous infractions would no doubt augment the sanction and increase the risk of revocation. See, e.g., Administrator v. Robinson, 1 NTSB 739 (1970) (revocation sought based on lack of qualification where Administrator argued that continuing pattern of misconduct demonstrated disregard of and lack of compliance with FARs).